IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| LOVELAND ACADEMY, L.L.C., PATRICIA DUKES, PH.D., and PARENTS AT LOVELAND SCHOOL<br><br>Plaintiff,<br><br>vs.<br><br>PATRICIA HAMAMOTO, Superintendent of the Hawaiʻi Department of Education, HERBERT WATANABE, Chairperson, Hawaiʻi Board of Education,<br><br>Defendants. | CIVIL NO.  CV02-00693 HG/LEK<br><br>DECLARATION OF PATRICIA DUKES |

## DECLARATION OF PATRICIA DUKES

Pursuant to 28 U.S.C. § 1746, Patricia Dukes, Ph.D., declares:

1. I am above the age of 18 years-old and make this declaration of my own personal knowledge.

2. I am the owner of Loveland Academy, L.L.C., which is a special school designed to provide a broad spectrum of special education and mental health services to children eligible for such services under IDEA on a day-treatment basis. In the day-treatment environment, the children attend school and

after-school activities at Loveland, and then return to their homes in the afternoon when these activities are concluded.

      3.      Loveland was granted accreditation by the Commission on Accreditation of Rehabilitation Facilities ("CARF"). CARF is an independent non-profit organization that provides accreditation in the human services field, focusing on the areas of rehabilitation, employment, child and family, and aging services. At the time Loveland received the initial CARF accreditation in 2002, it was the only accredited facility providing day-treatment services for children with autism in Hawai'i. The initial 3-year accreditation was the highest level of accreditation a service provider may be awarded and shows substantial fulfillment of the CARF standards. Loveland still is a CARF-accredited facility providing day treatment for children with autism in Hawai'i.

      4.      Prior to July 1, 2002, Loveland provided day-treatment services to children pursuant to contract with the Hawai'i Department of Health (the "Contract"), which set billing rates for children placed at Loveland under the Contract.

      5.      The Contract expired on June 30, 2002, and the Department of Education became responsible for providing autism services after that date, in place of the Department of Health. On July 1, 2002, Loveland's day-treatment

rates were raised and subsequent increases occurred in January 2003 and July 2003. The day-treatment rates were raised to cover increased costs associated with liability insurance, ground-lease rent and staff salaries.

      6.      In addition to children placed at Loveland through individualized educational plan, some students have been determined eligible for placement and services at Loveland through settlement agreement or Order of a hearing officer pursuant to 20 U.S.C. § 1415(f).

      7.      From the time the Contract expired June 30, 2002, and through 2004, I operated Loveland at a loss. I had to fund the programs, special education and related services at Loveland myself, and now have expended in excess of $600,000 of my own funds, have taken loans and experienced other financial and personal hardship keeping Loveland open, with the expectation that I would be reimbursed through the mediation that occurred in the present case. However, the DOE refused to pay the current day-treatment rates for any child, including those placed at Loveland by settlement agreement or hearing officer decision. Although I agreed to mediate, the mediation conducted in this case failed to produce any resolution.

      8.      The day-treatment rates and other increases in fees formed the basis of Loveland's budget. Loveland could not continue to operate at a deficit,

and I informed the parents that Loveland would close on April 2, 2004. All children placed there would have had to find other programs here or on the Mainland.

9. On March 22, 2004, the Court in this matter granted a preliminary injunction, ordered immediate payment in the amount of $250,000.00, which led ultimately, after four years of further proceedings, to settlement and payment of a total amount of $1,136,707.84 to Loveland/Lokahi. However, throughout the period from 2004 through the present, the Department contested what was owed and continues to this day to pay untimely or in partial the amounts owed for student services. In fact, as of August 2007, the Department owed more than $700,000.00, creating yet another crisis that led me to consider, once again, closing Loveland/Lokahi.

10. This was an important case as it addressed the civil rights of IDEA-eligible children and their families and assured the continued availability of the Loveland/Lokahi program, which provides special education and related services that would not otherwise be available in Honolulu if Loveland/Lokahi was forced through economic pressures to close.

11. Although the Court ruled in my favor in 2004 at a motion for preliminary injunction, and the Department subsequently signed a settlement

agreement by which remaining payments were to be calculated, the subsequent final resolution of the case took four years and was extremely difficult. I understand that there are 11 volumes of correspondence related to this case. Much of it was generated by me and my staff to request advice regarding nearly daily issues raised by the Department that led to delays and deficiencies in payment throughout the settlement period. I and my staff consulted with Mr. Varady and his assistant on nearly a daily basis and, often, several times a day.

      12.    The work by Mr. Varady with me and my staff to assemble, analyze and present six years of billing records, invoices, staff time records, client service logs, progress notes and summaries of these documents to the Court, mediator and Special Master, which, over time, filled more than 20 banker's boxes, required frequent consultation with Mr. Varady and his staff, my own CPA's, staff members and other experts to organize, analyze and present the information to the Special Master. Additionally, there was significant disagreement over the scope of the Special Master's work that required frequent consultation between me and Mr. Varady and between Mr. Varady, the Special Master and the Court.

      13.    The Special Master preliminarily concluded that Loveland/Lokahi had been overpaid and owed the Department $841,171.68. Mr. Varady's document analysis and memorandum in response resulted in a revised

recommendation by the Special Master that Loveland/Lokahi had been over paid and owed the Department $140,689.28. Subsequently, however, the Court adopted plaintiffs' position, rejected the recommendation of the Special Master's report and ruled that the Department owed Loveland/Lokahi $136,707.84. Thus, this lawsuit resulted in total payment of $1,136,707.84 to Loveland/Lokahi, which amount the Department had disputed. This is an excellent economic result that would not have occurred but for this lawsuit and Mr. Varady's and Cynthia Nakamura's work.

14. Mr. Varady and Cynthia Nakamura are seeking attorneys' and paralegal fees in this case, which advanced and resolved our claims and made it possible for Loveland/Lokahi to continue to provide services to children with autism and other disabilities.

15. This litigation took great perseverance because of the manner in which the Department resisted resolution and payment. It is likely that the acts that Loveland/Lokahi would have closed, but for this lawsuit. Neither the defendants, nor the Attorney General, ever conceded that the contract or its refusal to pay Loveland/Lokahi timely and in full was unlawful. In fact, the Department filed a request of the Special Master to amend his report after the Court's final ruling on the Special Master's report and recommendations, even though the Department had expressly agreed to waive any appeal or request for reconsideration of the Court's

ruling in the settlement agreement.

16. I personally experienced extreme economic, personal and professional hardship resulting from the Department's failure to pay Loveland/Lokahi timely and in full. Defendant's conduct resulted in staff turnover and shortages at Loveland/Lokahi. I also had to use personal funds to keep Loveland/Lokahi in operation. Because of the Department's repeated demands for additional documents as predicates to payment, I and my staff consulted Mr. Varady and Ms. Nakamura on almost a daily basis for advice and consultation, which impacted my and their ability to provide services.

17. I believe that Mr. Varady's and Ms. Nakamura's work produced an excellent result in the face of strong opposition and a defense that was unyielding, even after the Court's ruling. I believe their fees are reasonable as are their hourly rates.

18. I asked Robynn Hata, Loveland/Lokahi bookkeeper to calculate copying costs in this case, for photocopying associated with this case that cold could be documented from billing records. That cost was $1,148.69, which I believe does not account for the vast majority of copying that my staff did, in house.

I declare under penalty of perjury the foregoing is true.

DATED: Honolulu, Hawaiʻi, May   20  , 2008.

                                    /s/ Patricia Dukes
                                    PATRICIA DUKES, Ph.D.