THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| LOVELAND ACADEMY, L.L.C., PATRICIA DUKES, PH.D., and PARENTS AT LOVELAND SCHOOL<br><br>Plaintiff,<br><br>vs.<br><br>PATRICIA HAMAMOTO, Superintendent of the Hawai'i Department of Education, HERBERT WATANABE, Chairperson, Hawai'i Board of Education,<br><br>Defendants. | CIVIL NO.  CV02-00693 HG/LEK<br><br>DECLARATION OF STANLEY E. LEVIN |

**<u>DECLARATION OF STANLEY E. LEVIN</u>**

Pursuant to 28 U.S.C. § 1746, STANLEY E. LEVIN declares:

1. I was admitted to practice in Hawaii in March 1972. Later I was admitted to the bar of the Ninth Circuit Court of Appeals and still later to the bar of the United States Supreme Court.

2. My employment background is as follows: for the period September 1971 to July 1, 1972, I was the lawclerk to the Honorable Masajii Marumoto, Associate Justice of the Supreme Court of Hawaii. In that position, I

researched and wrote numerous drafts of opinions and communicated almost daily to the court about the pending cases.

3. In July 1972, I took a job with the Comprehensive Legal Services Program of Hawaii, which was a federally funded legal services organization providing civil and criminal representation to the poor in two locales in Hawaii in Kalihi-Palama and the Waianae Coast. During that time in Waianae, I filed and was successful in numerous class actions (one of which went to the U.S. Supreme Court) dealing with welfare, social security, rights to counsel in military summary courts martial, and other important issues.

4. In late 1974, I was transferred to the downtown Legal Aid Society of Hawaii office where I became a supervising attorney and was in charge of about 20 employees and agents working in the welfare, social security, food stamps, Medicaid, and health services area. I continued to file and pursue litigation quite actively on my own.

5. In 1977, I was appointed Litigation Director of the Legal Aid Society of Hawaii (which at the time had about 45 attorneys at its disposal statewide). Again, I continued to litigate cases on my own such as *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000 (9th Cir. 1981) (involving a constitutional challenge to the post-judgment garnishment system) and *Dennis v. Chang*, 611 F.2d

1302 (9th Cir. 1980). It was at the end of my tenure with the Legal Aid Society of Hawaii in 1979, that I briefed and argued the case of *Yamasaki v. Califano*, 442 U.S. 682 (1979).

      6. As litigation director, I was primarily responsible for all cases to be filed and filed by the Legal Aid Society of Hawaii. This job included the legal supervision of the approximately 45 attorneys and the 10 paralegals employed by the Society statewide.

      7. In the course of my work at Legal Aid, I was honored to be selected to join and participate with a very select group of public interest lawyers, some employed by legal services ands some employed by law schools and in private practice who formed a federal court training team that traveled around the county providing training to legal services staff attorneys and paralegals.

      8. In the course of this association, I taught many classes on such topics as the 11th Amendment, class actions, injunctions and Rule 65 remedies, and similar topics to at least 30 legal services staff attorneys at any given time. I was also required to do extensive writing and research on each of these topics.

      9. In 1979, I was selected to be the editor of the Federal Litigation Handbook, a published several hundred page book containing all of the topics and wisdom from the training which had been provided several years earlier. I did write

and edit this publication which was issued to hundreds of public interest attorneys around the country as of about June 1980.

10. At this same time, I joined forces with Mark Davis to form the law firm of Davis & Levin. This was in August 1980. We have been partners for the past 28 years in a firm specializing in personal injury and commercial and civil rights work. During this period, our firm has handled many complex and highly publicized cases including *Hawaii Psychiatric Society v. Ariyoshi*, 481 F.Supp. 1028 (D.Haw. 1979) (a case which received national celebrity as it upheld the rights of Medicaid patients guaranteed by the Fourth Amendment); *Rensenberger v. Gates*, Civil No. 94-0313 (2nd Circuit Court, June 1995) (a settlement upholding the first amendment rights of the press); *Rees v. Milici Valenti Gabriel DDB Needham, Inc., et al.*, Civil No. 93-00784; *Goldberg v. Nuuanu Mortuary*, Civil No. 92-00030 (a large personal injury settlement in favor of the family of a deceased Jewish woman who had a pig mysteriously appear in her coffin); *Barta v. City and County*, Civil No. 94-00572 (D.Haw. 1994) (a large personal injury settlement in the case of a female police officer who was subjected to alleged sexual harassment); and *Pineda v. United States*, Civil No. 89-00239; Appealed at Civil No. 97-16712 (largest personal injury judgment of $13 million against the federal government for medical malpractice); *Atchison v. Oahu Construction Co., Ltd.*, Civil No. 93-4360-

11, (1st Circuit Court, 1996) (a class action setlement for over 200 homeowners for personal and property damages as a result of defendants alleged negligence).

11. During the past 28 years, our firm has maintained its emphasis for doing civil rights and personal injury. In the civil rights area, I have ben instrumental in the past 10 years in expanding the firm's expertise to the disabilities area. Specifically, actions on behalf of disabled adults and children under the Americans with Disabilities Act (42 U.S.C. § 12101, et seq.) and Section 504 of the Rehabilitation Act, and the Individuals with Disabilities Education Act. Some of the litigation has focused on litigation that no other attorney in Hawaii has been or is pursuing. These are cases enforcing or dealing with proper self-evaluations and transition plans. For example, at least five of these cases dealt with the complete lack of curb cuts in the State of Hawaii.

12. Thus, on behalf of different clients, I filed cases against the City and County of Honolulu and all of the other counties for thei failure to have an adequate curb cut self-evaluation and adequate curb cuts. One of these cases caused an approximately $50 million curb cut fix over the next 57 years in Honolulu alone. These were significant victories and each case was settled and settled on very favorable grounds for the disabled plaintiffs and the disabled community.

13. I have also developed a substantial expertise in handling cases under the Individuals with Disabilities in Education Act (hereinafter IDEA), 20 U.S.C. 1401, et seq. I have handled no less than 150 of these cases during the past five to six years and have achieved some major victories for disabled children. One of the most significant was in the case of *Mark J. et al v. Department of Education*, Civil No. 97-00046 HG (decision filed on December 8, 1997), in which the court reversed an unfavorable hearing officer decision and issued an order that was dispositive on issues relating to many IDEA cases. (Fees paid in this case for obtaining the reversal totaled in excess of $75,000.)

14. A significant portion of my litigation involves cases brought against the State of Hawaii alleging constitutional and civil rights violations as well as violations of state statutes. Through frequent collaboration with plaintiffs attorney, Carl M. Varady, and my own work on a number of similar cases involving the interest of prisoners to secure, safe and humane incarceration, I am familiar with this case and have reviewed the Court's findings and conclusions in the case in chief and the Court's sanctions order. At various times throughout the history of this case, Mr. Varady has consulted with me concerning the facts and issues presented by this case.

15. In particular, Mr. Varady consulted with me directly on three

important issues. First, we discussed placement of a child who was the subject of this case, identified in Dr. Dukes declaration and the settlement agreement as G K-R. I had negotiated placement of this child with the Department, after first informing the Department that I would initiate a due process hearing. The Department agreed to placement without the need to proceed to hearing. However, after this agreement was reached, the Department refused to pay in full for the child's program, thereby jeopardizing the continued attendance of this child in the program at Loveland/Lokahi, which the Department already had agreed they needed and was appropriate. I had several discussions with Mr. Varady about the problems presented by the Department's conduct and its illegality.

16. Secondly, I had several discussions with Mr. Varady about the Department's refusal to pay for children who were placed in programs at Loveland/Lokahi by due process decision, settlement agreement or Individualized Educational Program. The possible closure of Loveland/Lokahi, as a result of economic distress caused by the Department's refusal to pay timely and in full for these children's programs, presented serious concerns to these children's and their parents' civil rights under the Individuals with Disabilities Education Act, ("IDEA"). These rights had been reaffirmed by the *Felix* consent decree, and I was very concerned that the Department's conduct in refusing to pay timely and in full

was a direct violation of stay-put principles under IDEA and the *Felix* decree. I urged Mr. Varady to pursue his clients' claims in this case, to assure those important rights were protected. Through this lawsuit, Mr. Varady was able to achieve more timely and complete payment and prevent Loveland/Lokahi's closure. This was of great benefit to the families and children receiving special education and related services at Loveland/Lokahi and prevented the loss of an important resource in Honolulu protecting the rights of children under IDEA and the *Felix* consent decree.

       17.    Finally, I also consulted with Mr. Varady regarding the "gag-clause" included in the Department's proposed contract for autism services at issue in this lawsuit. That clause stated:

> *Under the terms of this contract, the agency, its employees, or its subcontractors shall not take a position that is contrary to the established position of the Department of Education. Specifically, this term refers but is not limited to public statements, matters in litigation, administrative hearing, or informal dispute resolution.* ***A position contrary to the established position of the Department of Education means advocating, recommending, or rendering an official position that is contrary to the goals, objectives, course of treatment, or theoretical approaches endorsed by either the appropriate IEP/MP team or formal policy positions from the DOE.*** *This term shall not be construed to supercede best practices as established under the Interagency Performance Standards and Practice Guidelines.*

I concurred with Mr. Varady that this clause was a serious and unlawful

infringement of the civil rights of parents and children, as well as the advocacy and associational rights of special education and related service providers. Additionally, I believe the clause created ethical conflicts to special education and related service providers who might otherwise advocate for services for children under IDEA, which were appropriate and necessary for educational or social progress, but which the Department opposed, for fear of violating this contract term. I was consulted by services providers concerned about this clause and its effect on their ethical obligations. Because of these serious concerns I encouraged Mr. Varady to pursue declaratory and injunctive relief to eliminate this onerous and unlawful limitation. Through this lawsuit, Mr. Varady was successful in forcing the Department not only to abandon this contract requirement, but to amend its existing contracts to remove this limitation.

18. Through cases in which I have represented IDEA-eligible children and their families, I am aware of numerous instances where the Department has failed to provide appropriate special education and related services for children with autism that has resulted in the need to find private programs for them outside the Department. From 1999 through the present, therefore, Loveland/Lokahi has provided an important resource for such special education and related services in our community. Without the existence of the Loveland/Lokahi

program during this period, I am personally aware that numerous children I have represented would have been unable to obtain appropriate special education and related services. Therefore, Loveland/Lokahi's continued viability and survival during this period was very important to these children and their families. This lawsuit made Loveland/Lokahi's survival possible.

        19.    This was an important case as it addressed the civil rights of IDEA-eligible children and their families and assured the continued availability of a highly respected and valuable program providing special education and related services that would not otherwise be available in Honolulu if Loveland/Lokahi was forced through economic pressures to close.

        20.    My understanding of the present case is that, although the Court ruled in plaintiffs' favor in 2004 at a motion for preliminary injunction, and the Department subsequently signed a settlement agreement by which remaining payments were to be calculated, the subsequent final resolution of the case was extremely difficult. From my conversations with Mr. Varady, I understand that there are 11 volumes of correspondence related to this case and that, although the depositions and pleadings primarily focused on the motion for preliminary injunction, that the subsequent work by Mr. Varady, with the plaintiffs and Special Master, required assembly and analysis of six years of billing records, invoices,

staff time records, client service logs progress notes and summaries of these documents, which, over time, filled more than 20 banker's boxes I understand that this work required frequent consultation with plaintiffs' own CPA's, staff members and other experts to organize analyze and present the information to the Special Master. Additionally, I understand that there was significant disagreement over the scope of the Special Master's work that required frequent consultation with the Special Master and the Court.

21. Finally, I understand that the Special Master preliminarily concluded that Loveland/Lokahi had been overpaid and owed the Department $841,171.68. Mr. Varady's document analysis and memorandum in response resulted in a revised recommendation by the Special Master that Loveland/Lokahi had been over paid and owed the Department $140,689.28. Subsequently, however, the Court adopted plaintiffs' position, rejected this recommendation of the Special Master's report and ruled that the Department owed Loveland/Lokahi $136,707.84. Thus, this lawsuit resulted in total payment of $1,136,707.84 to Loveland/Lokahi, which amount the Department had disputed This is an excellent economic result that would not have occurred but for this lawsuit and Mr. Varady's work.

22. Mr. Varady is seeking attorney' and paralegal fees in this case in

the amount of $158,805.50 for the total hours expended. The amount of fees is less than 14% of the total amount recovered. Had Mr. Varady taken this case on a 1/3 contingency, his fee would have been $75,113.31, more than double what he now is seeking. Based on my own experience, knowledge of the law and my review of the facts of this case, I believe that all attorneys' fees incurred in this matter were reasonable and necessary to research, advance and resolve all of plaintiff's claims.

23. In reviewing the fee statement, I conclude that Mr. Varady used ordinary billing judgment in preparing this statement and did not include routine, but minor, expenditures of time for routine telephone calls, wrote off as "non-billable" minor expenditures of time and, where appropriate, used his legal assistant to perform appropriate work.

24. Litigating this type of case takes great perseverance because of the manner in which the governmental agency and/or employees being sued are vigorously represented. Few cases of this type settle because of the large amounts of money at stake and the fact that Department wants to control the contents and administration of its contracts It is likely that the acts that Loveland/Lokahi would have closed, but for this lawsuit. Neither the defendants nor the Attorney General ever conceded that the contract or its refusal to pay Loveland/Lokahi timely and in full was unlawful. In fact, the Department filed a request of the Special Master to

amend his report <u>after</u> the Court's final ruling on the Special Master's report and recommendations, even though the Department had expressly agreed to waive any appeal or request for reconsideration of the Court's ruling in the settlement agreement.

25. The present case was undesirable because of the complexity of the issues, the vast amount of records that had to be reviewed, analyzed and digested for presentation to the Court and Special Master  I understand that due to the extreme economic hardship resulting from the Department's failure to pay Loveland/Lokahi timely and in full, resulting in staff turnover and shortages, Dr. Dukes having to use personal funds to keep Loveland/Lokahi in operation and repeated demands for additional document by the Department as predicates to payment, Mr. Varady was consulted on almost a daily basis by plaintiffs for advice and consultation and frequently had to contact the Attorney General's office in response to these concerns.

26. I have known Carl M. Varady for 20 years. I have found him to be intelligent and diligent in his legal work. He has an excellent reputation in the

amend his report <u>after</u> the Court's final ruling on the Special Master's report and recommendations, even though the Department had expressly agreed to waive any appeal or request for reconsideration of the Court's ruling in the settlement agreement.

25. The present case was undesirable because of the complexity of the issues, the vast amount of records that had to be reviewed, analyzed and digested for presentation to the Court and Special Master  I understand that due to the extreme economic hardship resulting from the Department's failure to pay Loveland/Lokahi timely and in full, resulting in staff turnover and shortages, Dr. Dukes having to use personal funds to keep Loveland/Lokahi in operation and repeated demands for additional document by the Department as predicates to payment, Mr. Varady was consulted on almost a daily basis by plaintiffs for advice and consultation and frequently had to contact the Attorney General's office in response to these concerns.

26. I have known Carl M. Varady for 20 years. I have found him to

be intelligent and diligent in his legal work. He has an excellent reputation in the civil rights litigation community as a strong advocate for civil rights.

27. Because of my involvement in numerous cases in federal and state court I am aware of the prevailing fee rates in the community for services of lawyers in Honolulu who practice in the civil rights area.

28. The prevailing range of rates for attorneys who have skills and experience necessary to advance a case of this nature to judgment or settlement is $200-325 per hour.

29. I believe that a lawyer of Mr. Varady's competence, skill and experience should be compensated at a rate of not less that $275.00 per hour for a case of this nature for work prior to 2008 and $295.00 per hour for work done afterward. My understanding is that Mr. Varady has billed for such work at the rate of $275.00, for years and that rate has been routinely approved by the Courts. Plaintiffs' attorney produced an excellent result in the face of strong opposition and a defense that was unyielding, even after the Court's ruling. His fees are reasonable as is his hourly rate.

I declare the foregoing is true under penalty of perjury.

DATED: Honolulu, Hawai'i, May 20, 2008.

_____
STANLEY E. LEVIN