IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| LOVELAND ACADEMY, L.L.C., PATRICIA DUKES, PH.D., and PARENTS AT LOVELAND SCHOOL<br><br>Plaintiff,<br><br>vs.<br><br>PATRICIA HAMAMOTO, Superintendent of the Hawai'i Department of Education, HERBERT WATANABE, Chairperson, Hawai'i Board of Education,<br><br>Defendants. | CIVIL NO. CV02-00693 HG/LEK<br><br>DECLARATION OF ERIC A. SEITZ |

## DECLARATION OF ERIC A. SEITZ

I, ERIC A. SEITZ, declare under penalty of perjury as follows:

1. I am an attorney admitted to pracice in the United States District Court for the District of Hawaii and Hawaii state courts, the Ninth Circuit Court of Appeals and the United States Supreme Court. I have been licensed to practice law since 1970 and was licensed in Hawaii in 1974.

2. I was employed part time by the Legal Aid Society of Hawaii from 1976 through 1979. Since 1972, I have been in private practice. In my work

as a Legal Aid attorney and in my private practice I have been lead attorney in numerous civil rights cases involving constitutional and statutory claims in this Court, the Ninth Circuit, United States Supreme Court, Hawaii trial and appellate courts. The substantive rights asserted in these cases included rights protected under the First, Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments to the United States Constitution, rights protected under the Hawaii state constitution and statutes and the right to a free appropriate public education under federal and state laws.

      3.    A significant portion of my litigation involves cases brought against the State of Hawaii alleging constitutional and civil rights violations as well as violations of state statutes. Through frequent collaboration with plaintiff's attorney, Carl M. Varady, and my own work on a number of similar cases involving the interest of prisoners to secure, safe, and humane incarceration, I am familiar with this case and have reviewed the Court's rulings. At various times throughout the history of this case Mr. Varady has consulted with me concerning the facts and issues presented by this case.

      4.    In particular, Mr. Varady consulted with me directly on three important issues. First, we discussed placement of two children who were the subject of this case, identified in Dr. Dukes' declaration and the settlement

agreement as A.E.1 and A.E.2. I had negotiated placement of these two military dependents with the Department after first informing the Department that I would initiate due process hearings. The Department agreed to placement without the need to proceed to hearing; however, after this agreement was reached I am informed that the Department refused to pay in full for the children's program, thereby jeopardizing the continued attendance of these children in the program at Loveland/Lokahi, which the Department already had agreed they needed and was appropriate. I had several discussions with Mr. Varady about the problems presented by the Department's conduct with respect to these two children

   5. Secondly, I had several discussions with Mr. Varady, as well as my co-counsel in the *Felix* class action, Shelby Ann Floyd, about the Department's refusal to pay for children who were placed in programs at Loveland/Lokahi by due process decision, settlement agreement or Individualized Educational Program. The possible closure of Loveland/Lokahi, as a result of economic distress caused by the Department's refusal to pay timely and in full for these children's programs, presented serious concerns to these children's and their parents' civil rights under the Individuals with Disabilities Education Act, ("IDEA"). These rights had been reaffirmed by the *Felix* consent decree, and I was very concerned that the Department's conduct in refusing to pay timely and in full was a direct violation of

3

stay-put principles under IDEA and the *Felix* decree. I urged Mr. Varady to pursue his clients' claims in this case to assure those important rights were protected. Through this lawsuit Mr. Varady was able to achieve more timely and complete payment and prevent Loveland/Lokahi's closure which was of benefit to the families and children receiving special education and related services at Loveland/Lokahi and prevented the loss of a resource in Honolulu serving children under IDEA and the *Felix* consent decree.

      6.     Finally, I also consulted with Mr. Varady regarding the "gag-clause" included in the Department's proposed contract for autism services at issue in this lawsuit. That clause stated:

> *Under the terms of this contract, the agency, its employees, or its subcontractors shall not take a position that is contrary to the established position of the Department of Education. Specifically, this term refers but is not limited to public statements, matters in litigation, administrative hearing, or informal dispute resolution.* ***A position contrary to the established position of the Department of Education means advocating, recommending, or rendering an official position that is contrary to the goals, objectives, course of treatment, or theoretical approaches endorsed by either the appropriate IEP/MP team or formal policy positions from the DOE.*** *This term shall not be construed to supercede best practices as established under the Interagency Performance Standards and Practice Guidelines.*

I concurred with Mr. Varady that this clause was a serious and unlawful infringement of the civil rights of parents and children as well as the advocacy and

associational rights of special education and related service providers. Additionally, I believe the clause created ethical conflicts to special education and related service providers who might otherwise advocate for services for children under IDEA, which were appropriate and necessary for educational or social progress, but which the Department opposed, for fear of violating this contract term. Because of these serious concerns I strongly encouraged Mr. Varady to pursue declaratory and injunctive relief to eliminate this onerous and unlawful limitation. Through this lawsuit, Mr. Varady was successful in forcing the Department not only to abandon this contract requirement, but to amend its existing contracts to remove this limitation.

7. I am also familiar with the subject matter of the case through my work as an attorney representing IDEA-eligible children in *Felix, et al. v. Cayetano*, Civil No. 93-00367 DAE (D. Haw.), in which the United States District Court issued a consent decree mandating an identification process and a continuum of care for IDEA-eligible children in Hawaii. Mr. Varady was one of my cocounsel, from pre-filing in 1992 through the issuance of the consent decree in the *Felix* case.

8. During the course and scope of my work in the *Felix* case and other individual cases in which I represented IDEA-eligible children and their families, I am aware of numerous instances where the Department failed to provide

appropriate special education and related services for children with autism that resulted in the need to find private programs for them outside the Department. From 1999 through the present, therefore, Loveland/Lokahi has provided a resource for such special education and related services in our community. Without the existence of the Lovleand/Lokahi program during this period, numerous children may not have been unable to obtain appropriate special education and related services. Therefore, Loveland/Lokahi's continued viability and survival during this period was important to these children and their families, and I believe that this lawsuit made Loveland/Lokahi's survival possible.

       9.     This was an important case as it addressed the civil rights of IDEA eligible children and their families and assured the continued availability of a program providing special education and related services that would not otherwise be available in Honolulu if Loveland/Lokahi were forced through economic pressures to close..

      10.    My understanding of the present case is that, although the Court ruled in plaintiffs' favor in 2004 at a motion for preliminary injunction, and the Department subsequently signed a settlement agreement by which remaining payments were to be calculated, the subsequent final resolution of the case was extremely difficult. From my conversations with Mr. Varady, I understand that

there are 11 volumes of correspondence related to this case and that, although the depositions and pleadings primarily focused on the motion for preliminary injunction, that the subsequent work by Mr. Varady, with the plaintiffs and Special Master, required assembly and analysis of six years of billing records, invoices, staff time records, client service logs, progress notes and summaries of these documents, which, over time, filled more than 20 banker's boxes I understand that this work required frequent consultation with plaintiffs' own CPA's, staff members and other experts to organize analyze and present the information to the Special Master. Additionally, I understand that there was significant disagreement over the scope of the Special Master's work that required frequent consultation with the Special Master and the Court.

11. Finally, I understand that the Special Master preliminarily concluded that Loveland/Lokahi had been overpaid and owed the Department $841,171.68. Mr. Varady's document analysis and memorandum in response resulted in a revised recommendation by the Special Master that Loveland/Lokahi had been over paid and owed the Department $140,689.28. Subsequently, however, the Court adopted plaintiffs' position, rejected this recommendation of the Special Master's report and ruled that the Department owed Loveland/Lokahi $136,707.84. Thus, this lawsuit resulted in total payment of $1,136,707.84 to

Loveland/Lokahi, which amount the Department had disputed. This is an excellent economic result that would not have occurred but for this lawsuit and Mr. Varady's work.

12.  Mr. Varady is seeking attorney' and paralegal fees in this case in the amount of $158,805.50 for the total hours expended. The amount of fees is less than 14% of the total amount recovered. Had Mr. Varady taken this case on a 1/3 contingency, his fee would have been $375,113.31, more than double what he now is seeking. Based on my own experience, knowledge of the law and my review of the facts of this case, I believe that all attorneys' fees incurred in this matter were reasonable and necessary to research, advance and resolve all of plaintiff's claims.

13.  Litigating this type of case takes great perseverance because of the manner in which the governmental agency and/or employees being sued are vigorously represented. Few cases of this type settle because of the large amounts of money at stake and the fact that Department strenuously asserts its interests to control the contents and administration of its contracts

14.  The present case was challenging because of the complexity of the issues, the vast amount of records that had to be reviewed, analyzed and digested for presentation to the Court and Special Master

15.  I am informed that Mr. Varady was consulted on almost a daily

basis by plaintiffs for advice and consultation and frequently had to contact the Attorney General's office in response to these concerns.

16. I have known Carl M. Varady for twenty years and found him to be intelligent and diligent in his legal work. He has an excellent reputation in the civil rights litigation community as a strong advocate for civil rights

17. Because of my involvement in numerous cases in federal and state court I am aware of the prevailing fee rates in the community for services of lawyers in Honolulu who practice in the civil rights area.

18. The prevailing range of rates for attorneys who have skills and experience necessary to advance a case of this nature to judgment or settlement is $200-350 per hour.

19. I believe that a lawyer of Mr. Varady's competence, skill and experience should be compensated at a rate of not less that $275.00 per hour for a case of this nature for work prior to 2008 and $295.00 per hour for work done afterward. My understanding is that Mr. Varady has billed for such work at the rate of $275.00, for years and that rate has been routinely approved by the Courts. Plaintiffs' attorney produced an excellent result in the face of strong opposition and a defense that was unyielding, even after the Court's ruling His fees are reasonable

as is his hourly rate.

DATED: Honolulu, Hawai'i, May __20__, 2008.

_____
ERIC A. SEITZ