IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| LOVELAND ACADEMY, L.L.C., PATRICIA DUKES, PH.D., and PARENTS AT LOVELAND SCHOOL<br><br>       Plaintiff,<br><br>vs.<br><br>PATRICIA HAMAMOTO, Superintendent of the Hawaiʻi Department of Education, HERBERT WATANABE, Chairperson, Hawaiʻi Board of Education,<br><br>       Defendants. | CIVIL NO.   CV02-00693 HG/LEK<br><br>DECLARATION OF IRENE E. VASEY |

## DECLARATION OF IRENE E. VASEY

Pursuant to 28 U.S.C.§ 1746, IRENE E. VASEY, hereby declares:

1.      I make this declaration in support of the Plaintiffs' Rule 54(d)

Motion for a Determination of Attorneys' Fees and Costs submitted herein.

2.      I am an attorney licensed to practice law in all courts of the

State of Hawaii and in the United States District Court for the District of Hawaii.

3.      I have been licensed to practice law in Hawaii since 1993.  My

legal background includes experiences as a family court-appointed guardian *ad*

*litem* and parent attorney, and five years as litigation manager for the Domestic Violence Clearinghouse and Legal Hotline.

4.    I began handling IDEA cases in 2001 when I was hired as Staff Attorney by the non-profit Legal Services for Children, located in Waianae.  Since 2003, I have been in private practice, concentrating in the area of education law representing students with disabilities under the IDEA.  I have appeared as counsel in approximately 85 independent IDEA legal actions.

5.    Through frequent collaboration with plaintiff's attorney, Carl M. Varady, and my own work on a number of similar cases I am familiar with this case and have reviewed the Court's findings and conclusions in the case in chief and the Court's sanctions order.  At various times throughout the history of this case, Mr. Varady has consulted with me concerning the facts and issues presented by this case.

6.    I had several discussions with Mr. Varady about the Department's refusal to pay for children who were placed in programs at Loveland/Lokahi by due process decision, settlement agreement or Individualized Educational Program.  The possible closure of Loveland/Lokahi, as a result of economic distress caused by the Department's refusal to pay timely and in full for these children's programs, presented serious concerns to these children's and their

parents' civil rights under the Individuals with Disabilities Education Act, ("IDEA"). These rights had been reaffirmed by the *Felix* consent decree, and I was very concerned that the Department's conduct in refusing to pay timely and in full was a direct violation of stay-put principles under IDEA and the *Felix* decree. Through this lawsuit, Mr. Varady was able to achieve more timely and complete payment and prevent Loveland/Lokahi's closure. This was of great benefit to the families and children receiving special education and related services at Loveland/Lokahi and prevented the loss of an important resource in Honolulu protecting the rights of children under IDEA and the *Felix* consent decree.

7. Finally, I am aware of the "gag-clause" included in the Department's proposed contract for autism services, at issue in this lawsuit. That clause stated:

> *Under the terms of this contract, the agency, its employees, or its subcontractors shall not take a position that is contrary to the established position of the Department of Education. Specifically, this term refers but is not limited to public statements, matters in litigation, administrative hearing, or informal dispute resolution. **A position contrary to the established position of the Department of Education means advocating, recommending, or rendering an official position that is contrary to the goals, objectives, course of treatment, or theoretical approaches endorsed by either the appropriate IEP/MP team or formal policy positions from the DOE.** This term shall not be construed to supercede best practices as established under the Interagency Performance Standards and Practice Guidelines.*

I concurred with Mr. Varady that this clause was a serious and unlawful infringement of the civil rights of parents and children, as well as the advocacy and associational rights of special education and related service providers. Additionally, I believe the clause created ethical conflicts to special education and related service providers who might otherwise advocate for services for children under IDEA, which were appropriate and necessary for educational or social progress, but which the Department opposed, for fear of violating this contract term. Through this lawsuit, Mr. Varady was successful in forcing the Department not only to abandon this contract requirement, but to amend its existing contracts to remove this limitation.

8.      Through cases in which I have represented IDEA-eligible children and their families, I am aware of numerous instances where the Department has failed to provide appropriate special education and related services for children with autism that has resulted in the need to find private programs for them outside the Department.  Since 1999, Loveland/Lokahi has provided an important resource for such special education and related services in our community.  Without the existence of the Lovleand/Lokahi program, I am personally aware that numerous children I have represented would have been unable to obtain appropriate special education and related services.  Therefore,

Loveland/Lokahi's continued viability and survival during this period was very important to these children and their families. This lawsuit made Loveland/Lokahi's survival possible.

9.    This was an important case as it addressed the civil rights of IDEA-eligible children and their families and assured the continued availability of a highly respected and valuable program providing special education and related services that would not otherwise be available in Honolulu if Loveland/Lokahi was forced through economic pressures to close.

10.    My understanding of the present case is that, although the Court ruled in plaintiffs' favor in 2004 at a motion for preliminary injunction, and the Department subsequently signed a settlement agreement by which remaining payments were to be calculated, the subsequent final resolution of the case was extremely difficult. From my communications with Mr. Varady, I understand that there are 11 volumes of correspondence related to this case and that, although the depositions and pleadings primarily focused on the motion for preliminary injunction, that the subsequent work by Mr. Varady, with the plaintiffs and Special Master, required assembly and analysis of six years of billing records, invoices, staff time records, client service logs, progress notes and summaries of these documents, which, over time, filled more than 20 banker's boxes. I understand

5

that this work required frequent consultation with plaintiffs' own CPA's, staff members and other experts to organize analyze and present the information to the Special Master. Additionally, I understand that there was significant disagreement over the scope of the Special Master's work that required frequent consultation with the Special Master and the Court.

11.     Finally, I understand that the Special Master preliminarily concluded that Loveland/Lokahi had been overpaid and owed the Department $841,171.68.  Mr. Varady's document analysis and memorandum in response resulted in a revised recommendation by the Special Master that Loveland/Lokahi had been over paid and owed the Department $140,689.28.  Subsequently, however, the Court adopted plaintiffs' position, rejected this recommendation of the Special Master's report and ruled that the Department owed Loveland/Lokahi $136,707.84. Thus, this lawsuit resulted in total payment of $1,136,707.84 to Loveland/Lokahi, which amount the Department had disputed.  This is an excellent economic result that would not have occurred but for this lawsuit and Mr. Varady's work.

12.     Mr. Varady is seeking attorney' and paralegal fees in this case in the amount of $158,805.50 for the total hours expended.  The amount of fees is less than 14% of the total amount recovered.  Had Mr. Varady taken this case on a

1/3 contingency, his fee would have been $375,113.31, more than double what he now is seeking. Based on my own experience, knowledge of the law and my review of the facts of this case, I believe that all attorneys' fees incurred in this matter were reasonable and necessary to research, advance and resolve all of plaintiff'ʼs claims.

13.    In reviewing the fee statement, I conclude that Mr. Varady used ordinary billing judgment in preparing this statement and did not include routine, but minor, expenditures of time for routine telephone calls, wrote off as "non-billable" minor expenditures of time and, where appropriate, used his legal assistant to perform appropriate work.

14.    Litigating this type of case takes great perseverance because of the manner in which the governmental agency and/or employees being sued are vigorously represented.  Few cases of this type settle because of the large amounts of money at stake and the fact that Department wants to control the contents and administration of its contracts.  It is likely that the acts that Loveland/Lokahi would have closed, but for this lawsuit.  Neither the defendants nor the Attorney General ever conceded that the contract or its refusal to pay Loveland/Lokahi timely and in full was unlawful.  In fact, the Department filed a request of the Special Master to amend his report after the Court's final ruling on the Special Master's report and

recommendations, even though the Department had expressly agreed to waive any appeal or request for reconsideration of the Court's ruling in the settlement agreement.

15.    The present case was undesirable because of the complexity of the issues, the vast amount of records that had to be reviewed, analyzed and digested for presentation to the Court and Special Master.   I understand that due to the extreme economic hardship resulting from the Department's failure to pay Loveland/Lokahi timely and in full, resulting in staff turnover and shortages, Dr. Dukes having to use personal funds to keep Loveland/Lokahi in operation and repeated demands for additional document by the Department as predicates to payment, Mr. Varady was consulted on almost a daily basis by plaintiffs for advice and consultation and frequently had to contact the Attorney General's office in response to these concerns.

16.    I have known Carl M. Varady for 6 years and regularly consult him in matters related to IDEA. I have referred clients to him as well.  I have found him to be intelligent and diligent in his legal work. He has an excellent reputation in the civil rights litigation community as a strong advocate for civil rights.

17.    Because of my involvement in numerous cases in federal and state court I am aware of the prevailing fee rates in the community for services of

lawyers in Honolulu who practice in the civil rights area.

18.    The prevailing range of rates for attorneys who have skills and experience necessary to advance a case of this nature to judgment or settlement is $200-325per hour.

19.    I believe that a lawyer of Mr. Varady's competence, skill and experience should be compensated at a rate of not less that $275.00 per hour for a case of this nature for work prior to 2008 and $295.00 per hour for work done afterward.  My understanding is that Mr. Varady has billed for such work at the rate of $275.00, for years and that rate has been routinely approved by the Courts. Plaintiffs' attorney produced an excellent result in the face of strong opposition and a defense that was unyielding, even after the Court's ruling.  His fees are reasonable as is his hourly rate.

I declare the foregoing is true under penalty of perjury.

DATED:  Honolulu, Hawai'i, May ___20___, 2008.


/s/ Irene E. Vasey
IRENE E. VASEY